Although some are quick to point out that race relations have become less salient since the last presidential election, researchers argue that racism and discriminatory practices have not disappeared, but instead have transformed into less overt and subsequently, more subtle forms. McConahay (1986) coined the phrase "modern racism," to describe this more subtle form of racial discrimination, and Katz and Hass (1988) refer to this phenomenon as "ambivalent racism". These terms describe the capacity of individuals in power to express racially biased views under the guise of ideas and actions that focus on individual opportunity and mobility (Deitch et al, 2003). Although most people today would maintain that they do not hold racist views, researchers have found racial bias in actions and behaviors that have the same outcomes as did the old fashioned variety of racial bias (i.e., overt acts); thus the actions and behaviors reflect racial bias and are also more damaging than "conventional racism" or "aversive racism" due to their subtly and disguise (Brief & Barsky, 2000; Dovidio & Gaertner 2002; Krieger, 2001).

Dovidio and Gaertner, (2001) offers evidence from a range of studies as to how, and under what situations, racial bias is likely to be enacted. Their studies, and others like them, support the notion that racial bias and racism rarely occur in the form of overt acts of racial animus, but rather as racial bias disguised by plausible non-racial justifications. For Black Americans, the effect of subtle racial bias is neither hidden nor insignificant. Dovidio and Gaertner (2002) and Essed (1991) show that the more subtle forms of racism and discrimination add to the denigration of Black Americans' "lived experience". Although researchers have demonstrated the negative effects of "aversive racism" or "conventional racism", the impact of the more subtle forms of racial discrimination is often intensified due to the denial or lack of attention given to it even by those who would classify themselves as champions of equality

(Gaertner & Dovidio, 1996; Utsey, 2001).

Dovidio et al, (2001) also observed that the change in the legal landscape associated with racial discrimination has discouraged more overt forms of discrimination in the workplace, yet the law has not adequately addressed the far more frequent subtle forms of discrimination. Brief, Butz, and Deitch (2005) state that, "due to federal laws and EEOC guidelines, Whites may be sensitized to blatant discriminatory acts in the workplace and attempt to avoid them, yet more subtle, 'everyday' forms of discrimination may persist largely unchecked" (p. 1302). Therefore, targets of discriminatory practices seem to have less recourse in battling and seeking restitution while having to endure the negative effects, in many instances, in silence. Miller and Kaiser (2001) argue that, "discrimination is taxing because it impedes access to opportunities and adversely affects interpersonal interactions, resulting in psychological and physiological stress responses, such as negative emotions and heightened blood pressure" Modern racism is often expressed through policies and practices.

Paap (2008) discussed the unstable nature of working conditions for racial minorities due to the labor practices of managers who employ union workers. The labor industry has been described as a hostile environment that has often created union and industry practices that exclude racial minorities, immigrants, and women (Paap, 2008; Roediger, 1999). In his 2008 study, Paap pointed to the covert ways in which racial discrimination has been present in the labor industry. He noted that discriminatory practices are often not explicit, and that "the verbal, social, and interactive practices that make up work culture simultaneously promote and deny systematic inequalities" (p. 378). Paap also stated that the ability of employers to deny practices that promote inequality allows for an atmosphere of distrust and unfairness that has a negative impact on those affected. It also appears to allow union representatives and managers to ignore

their responsibility to protect all workers equally while denying accountability for neglecting instances of racial bias and discrimination. Once again, it has been documented that those affected by unfair practices are often unable to find any solace or redress due to an environment that purports an egalitarian stance (Light, Roscigno, & Kalev, 2011).

Researchers have noted that racial minorities and others viewed as 'outsiders' (i.e., generally denoting individuals who did not belong to the dominant group) were more likely to be held accountable for mistakes made on the job, while those viewed as insiders (i.e., members of the dominant group) were not held accountable for mistakes in the same way. Paap (2008) goes on to state that outsiders' mistakes were generally attributed to lack of intelligence, skills, and commitment to the work, while mistakes by insiders were explained as a lapse in concentration or to other reasons outside of one's control. Paap (2008) posited that this identification of "good" and "bad" workers is often due to "existing stereotypes and preferences, predetermined perception, and the existing affiliations and hierarchies among workers" (p. 380).

Researchers agree that employment discrimination is a very complex phenomenon that is often confounded by individual behaviors and misinterpretations. Studies have reported that racial harassment cases represent 20% of lawsuits filed by middle class Black Americans (Roscigno, Williams, & Byron, 2012). Although claims are made more often by middle class as compared to working class Black Americans, researchers contend that this disparity in claims is likely due to middle class claimants' relative financial stability and ability to seek redress while remaining in the same organization (Roscigno, Williams, & Byron, 2012).

Kalev, Dobbin, and Kelly (2009) report that both middle and working class Black Americans remain vulnerable to inequalities in the workplace due to a lack of accountability on the part of employers when it comes to diversity training and discrimination policies adopted by

large organizations. McBrier and Wilson (2004) report that often times, Black Americans are placed in jobs in order to manage racial tensions while simultaneously receiving unfavorable evaluations that aren't based on actual job performance but instead on negative stereotyping. Collins (1997) reported that this practice undercuts seemingly qualified and talented Black Americans while also marginalizing their potential to succeed and advance (Collins, 1997; McBrier & Wilson, 2004).

     Roscigno, Garcia, and Bobbit-Zeher (2007) report that in addition to experiencing racial harassment, Black Americans are also subjected to "differential criteria" by gatekeepers. In essence, Black Americans are held back due to the discretion of these gatekeepers (e.g., supervisors and managers) who often times judge work performance through "racially biased" lenses. In their study, Roscigno et al, (2007) looked at racial and sexual discrimination charges filed with the Civil Rights Commission in Ohio between 1988 and 2003. They found that Black Americans were "policed more closely and sanctioned more often and severely" (p. 42) than their White counterparts. They also found that even in what is often called a "post-racial era", workplaces continue to be racially charged and Black Americans are affected in ways that are not always adequately captured by empirical research.

     Light, Roscigno, and Kalev (2011) report that the industrial workforce is often viewed as egalitarian and meritocratic but unfortunately, does not always live up to that expectation. They found evidence that although organizations may adopt policies that promote the reduction of conscious and unconscious racial bias, organizations may also serve as 'harbors for bias'. For instance, Light et al, (2011) stated that "bias and meritocratic structures can and often do exist together" (p. 57). In other words, it is often the case that organizations that tout egalitarian work conditions, often suffer from the same racially biased conditions found in other areas of industry.

Deitch et al, (2005) posited that "modern racists" often believe they are not racist and use "non-prejudiced" explanations to rationalize what others would identity as racist acts (Brief & Barsky, 2000; Brief, Butz, & Deitch 2005; Dovidio et al., 1997).

*S*tudies have also found negative mental health outcomes associated with experiences of discrimination specifically at work. For example, Broudy et al. (2007) found that racial stigma, social distance, work-based discrimination, threat and aggression were positively associated with daily ratings of anger, sadness, and nervousness, as well as perceptions of routine social interactions as "harassing or exclusionary" (p. 39). These findings held after controlling for personality attributes and lifetime experiences of interpersonal racial discrimination. Broudy et al.'s findings of work-related racial encounters (stigma, threat, and avoidance) showed associations with regular and consistent negative mood states (i.e., current anger, anxiety, sadness, fatigue, and guilt). Furthermore, encounters of rejection, avoidance and exclusion, unfair treatment, and being disrespected were related to anxiety, anger, sadness, fatigue and guilt.

In another study, Schneider, Hitlan, and Radhakrshan (2000) examined the experiences of being excluded and verbal harassment in the workplace among Hispanic men and women. Their results indicated that verbal harassment and exclusion were significantly associated with less life satisfaction, Post-Traumatic Stress Disorder (PTSD) symptoms, and health conditions (e.g., headaches, exhaustion). Hammond, Gillen, and Yen (2010) asked hospital employees if coworkers or supervisors treated them unfairly. The respondents were directed to indicate how come they were treated so – due to race or other characteristics. Participants reported unfair treatment in hiring practices, performance evaluations, work assignments, promotions, and day-to-day work interactions. Fifty-seven percent (57%) of respondents reported that workplace discrimination was attributed to race and it was found that this discrimination was significantly

positively associated with depression. Overall, the researchers did not find significant racial group differences in this study, but Black Americans reported experiencing more racial discrimination in their day-to-day workplace encounters. Thus, these aforementioned studies show that encounters with discrimination at workplaces are also associated with poor mental health outcomes.

*Legal History of Racial Discrimination in Companies and Labor Unions*

A key allegation in this case by the plaintiff is that the union steward and union representative and company employees did not pass on his compliant of racial discrimination, and that the actions taken against him were racially motivated.

The following is a brief review of legal cases that show that similar allegations have been made by other employees and union members in similar situations. These cases support the assertion that it might be possible for the company and union personnel to have ignored the plaintiff's complaints, and that in this instance the plaintiff's claims may have merit and thus should have been taken seriously. Racial minority employees have been discriminated against in company hiring practices, job assignments, promotions, and transfers, and in some cases explicit policies or procedures have been enacted to deny Blacks access to employment opportunities or place them in lower paying or less desirable jobs (see Cannon v. Bradbury Burial Vault Co, 2011; Crawley v. Norfolk Southern Corporation, 2012; E.E.O.C. v. Concrete Applied Const. Technologies, 2007; Frunco Construction Corp., v. Waters, 1978; Goodman v. Lukens Steel Company, 1984; James v. Countrywide Financial Corp, 2012; Jackson v. T & N Van Services, 2000; Macklin v. Spector Freight Systems, Inc., 1973; McDonnell Douglas Corp. v. Green, 1973; Robinson v. Llorillard Corp, 1971; United Packinghouse, Food and Allied Workers International Union v. NLRB, 1969). The following brief review of recent lawsuits provides

evidence and documentation that similar types of incidents to those alleged in this case have occurred to others.

*Racial Discrimination Lawsuits Against Employers*

In 2012, a Black male (Plaintiff) branch manager filed suit against his employer for various claims of discrimination including 1) slow processing of his customer's loan applications (compared to White co-workers' customer loan applications), 2) unequal pay (compared to White co-branch manager), and 3) less favorable treatment (i.e. superiors would not return his calls as quickly or did not support him in meetings as they did with his White co-manager) (James v. Countrywide Financial Corp, 2012).

In 2011, a Black employee (Plaintiff) alleged that the company that employed him 1) allowed his co-workers to harass him and call him racial epithets (i.e., called "n-word", "coon" and told to listen to 'jungle music' over several years), and 2) created a hostile work environment by not disciplining the co-workers. According to the case, the plaintiff was involved in two physical altercations with said employee and reported all incidents. However, the employer did not discipline the co-worker or encourage the plaintiff to file a grievance with the union (Cannon v. Bradbury Burial Vault Co., 2011). Also in 2011, an African-American executive at Norfolk Southern Corporation alleged that his employer discriminated against him by disciplining him for his decisions regarding an employee's work-related injury (Crawley v. Norfolk Southern Corporation, 2012).

In 2003, the Equal Employment Opportunity Commission ("EEOC") (Plaintiff) alleged CATCO Construction Co had discriminated against an African American employee by not hiring him as an operating engineer due to his race. The parties entered a consent decree whereby, in addition to financial obligations on behalf of the defendant, the defendant was charged with

ongoing intensive training and adaptation of EEO policies regarding a discrimination-free work environment (E.E.O.C. v. Concrete Applied Const. Technologies, 2007).

In 1994, two Black males, both garage mechanics, were fired after they refused to attend a disciplinary hearing because they did not receive adequate notice under their Collective Bargaining Agreement. The employees were notified about the hearing the morning of and were subsequently suspended for two days. The employees filed a grievance with the union and received their 2 days back pay (Rivers v. Roadway Express, Inc., 1994).

In most workplaces the Union is the group that protects the employee's rights and guards against discrimination or mistreatment such as those alleged above. In other instances, Unions have been accused of violating anti-discrimination laws.

*Racial Discrimination by Unions*

The Federal Civil Rights Act prohibits discrimination by unions in the same way that it prohibits discrimination by employers. In fact, unions have an affirmative obligation to oppose discrimination of its members by their respective employers. However, a review of literature shows a history of racially discriminatory behavior by various U.S. labor unions. Several lawsuits have been filed over the last 70 years and highlight patterns of discriminatory behaviors experienced by racial or ethnic minority employees, particularly African Americans.

For example, there is a history of allegations against labor unions for <u>failed duty to fair representation</u> (i.e., to protect all employees equally) (e.g. See Macklin v. Spector Freight Systems, Inc., 1973). Although the Civil Rights Act indicates that a union is legally liable when it agrees or joins an employer's discriminatory practices, unions have participated in the <u>creation or negotiation of contract provisions</u> that discriminate against Blacks or deny them equal employment opportunities (Armstrong v. School District of Philadelphia, 1984). Unions have

also helped to establish contract provisions that allow <u>discriminatory seniority systems</u>, which have a negative effect on Black employees (Donaldson v. Taylor Products Division of Tecumseh Products, Inc., et al., 1980; Robinson v. Llorillard Corp, 1971; Water v. Wisconsin Steel Works of International Harvester Company, 1974).

Although labor unions have an affirmative duty to combat discrimination in the workplace, several legal cases show unions have been accused of participating in allowing employees to discriminate against Blacks (Armstrong v. School District of Philadelphia, 1984) and <u>aiding and abetting</u> White employees in violation of discrimination laws (Jackson v. T & N Van Services, 2000).

When allegations of racial discrimination have been brought to unions, a review of prior lawsuits shows a discriminatory pattern by some unions that have **<u>failed and/or refused to assert racial discrimination as a ground for a grievance</u>** (see Goodman v. Lukens Steel Company, 1984; Local Union 12, United Rubber, Cork, Linoleum & Plastic Workers of America v. NLRB, 1966) and it is alleged that some unions **<u>failed to process grievances for Black employees on the same bases as for White employees</u>** (Armstrong v. School District of Philadelphia, 1984). Several lawsuits suggest that Unions have also been accused of **<u>failing to take claims of racial discrimination to arbitration</u>** (See Donaldson v. Taylor Products Division of Tecumseh Products, Inc., 1980; Local Union 12 v. NLRB, 1966; Macklin v. Spector Freight Systems, Inc., 1973; Vaca v. Sipes, 1967). In general, the aforementioned discriminatory patterns provide an indication that a number of unions and employers have allegedly engaged in discriminatory practices against racial and ethnic minority members. The cases below provide evidence that some unions continue to struggle when it comes to ensuring a discrimination-free environment for all employees.