Race-based traumatic stress injury has at least two core reactions that may be expressed through one or several modalities (physiological, emotional, cognitive, or behavioral). They are *intrusion*, *arousal*, and *avoidance*. Symptoms of *intrusion* or re-experiencing includes having thoughts or images that "intrude" on daily life, experiencing reoccurring images of the encounter (re-experiencing), or having difficulty with concentration. *Arousal* or hyperactivity includes feeling anxious or expressing anger through aggression or hyper-reactivity, experiencing sleeplessness or being easily startled, or experiencing a state of constant alert. *Avoidance* can be expressed as psychic numbing, becoming distrustful and emotionally detached from people, becoming emotionally "numb" and losing interest in pleasurable activities, denying any connection between one's current emotional and psychological state and the incident, or having limited recall for specific elements of the event(s), and staying away from the people or the location of the event.

The core reactions of *intrusion, arousal and/or avoidance* that people experience may manifest in other symptoms, such as depression and anxiety that reflect or contain elements the core reactions. Similarly, one may experience a loss of self-worth or one may have difficulty with intimate and interpersonal relationships. Guilt and shame may arise due to self-blame and a sense of responsibility for the experience. Targets of hostile racial environments may experience reactions such as depression, low self-esteem, self-doubt, and emotional pain. The psychological injury may be manifested in constant fear and/or a lack of security in one's well being.

For assessing racial incidents, it is more accurate to employ the notion of psychological injury wherein the cause of distress or trauma is an emotional assault. The concept of injury does a better job of capturing the types of violations and assaults inherent in race-based

encounters and experiences. The injury in the current case is primarily psychological and emotional (Lee, 2000).

Furthermore, it should be pointed out that the manner in which a particular person responds to the experience of perceived racial hostility depends on the specifics of the event, the nature and type of support they have and their own ability to cope. Targets of racial harassment describe feelings of shock, confusion, helplessness, general anxiety, generalized fear, negative self-concept and feelings of low self-esteem, frustration, bitterness, anger and rage, as well as any combination of these feelings. The symptoms and feelings can result in altered social lives, as well as rage, fear and alienation. Research has shown that people with fewer resources, and people who are older will have more difficulty coping with encounters of racial hostility or a racially hostile environment (Brondolo et al., 2009). Thus, such people will be more likely to suffer harm and emotional injury from a hostile racial environment.

*Coping with Racial Discrimination*

Black people have learned to cope with racial discrimination and harassment in many different ways, from denial to over-achievement, yet it is clear from research that they generally expect people in positions of authority to be helpful, not demeaning (Crockett, et al., 2003). Therefore, while Blacks' struggles with racial discrimination or harassment may not be consistently overt and observable, it would be erroneous to conclude that they do not make efforts to cope with these types of experiences. Feagin and Sikes (1994), Brondolo et al (2009) and Crockett, et al. (2003) describe coping strategies Black people use in their effort to deal with encounters with racial discrimination. People often avoid the situations and people associated with the racial harassment or discrimination or they deny that the action was based on race to avoid conflict: "if one can name racial discrimination something else, it may not hurt so much"

(Feagin & Sikes, 1994, p. 277). They may minimize the problem or do nothing for fear of contributing to or creating more of a problem. Another strategy is resigned acceptance as a way to balance frustration with the most productive or effective response. On more rare occasions, some will confront the perpetrator, but this means of coping comes with a cost. "[B]y regularly confronting whites. . . . [B]lack Americans run the risk of being ostracized or labeled" (Feagin & Sikes, 1994, p. 282) because Whites might deny that the event or encounter was due to race or racial discrimination and thus indirectly blame the minority who complains or dismiss the claim as false (Bryant & Ocampo, 2005; Feagin, 1991).

Furthermore, in cases where the discrimination or harassment is particularly severe, people may fear that confrontation will result in increased conflict and harm. As a result, many people choose to withdraw and others become distrustful. Still others may be more active in their coping by being defiant and assertive. They may lodge verbal complaints or they may cope by taking legal action (Brondolo et al., 2009; Essed, 1991; Feagin & McKinney, 2003).

Some individuals who experience discrimination rely on personal resources such as social support to cope with the events. For example, Noh and Kaspar (2003) found that individuals who accessed their social support networks after experiences of discrimination were less depressed than those who did not. Being grounded within a group identity (e.g., ethnic or racial group) has also been shown to reduce the negative effects of discrimination. One researcher (e.g., Mossakowski, 2003) found that individuals who had higher levels of racial identity (i.e., racial group identification) had fewer depressive symptoms after exposure to racial discrimination. Therefore, having a strong sense of group identity may prevent individuals from defining their self-worth based on the negative stereotypes associated with experiences of discrimination.

As noted previously, coping with racism and hostile racial environments is a complex and emotionally, spiritually and intellectually demanding process, which can be particularly difficult for people with limited education and minimal economic resources. People exposed to racially hostile situations have to manage their worries about the short and long-term impact the situation, and their responses to it, could have on other racial group members as well as family and friends. While trying to deal with the external stressor it is also necessary to manage and limit, if possible, any damage to one's self worth.

*Recognizing Racial Discrimination*

Although the research consistently indicates that rates of racial discrimination and harassment continue to be high, particularly for African Americans, there are differences in how people recognize, and react to, these experiences that account for the differences in reporting encounters with racial discrimination. Therefore, it is important to note some of the reasons for the differences in recognizing racial discrimination.

In her study of everyday racial discrimination, Essed (1991) found that certain thought processes and experiences were needed to recognize everyday discrimination that is subtle and institutional, and to a lesser extent to recognize more blatant and direct old-fashioned forms of racism (e.g., racial epithets, slurs, displaying symbols of racial intimidation, etc.). She argues that to recognize racial discrimination, members of racial minority groups need to understand their encounters with racism in terms of their racial groups' experience, accept as accurate the historical treatment of their racial group, and be able to acknowledge that their personal experience is connected to the collective experiences of their racial group.

The absence of this general knowledge can make it difficult for one to understand and recognize the meaning of subtle or indirect racial discrimination or hostile racial environments.

The general knowledge necessary for processing racial information is consistent with empirically supported models of racial identity statuses, which have been associated with perceiving discrimination (e.g., Carter, 1995; 2005; Forsyth & Carter, 2012). Thus, for a Black person to recognize racial discrimination or a racially hostile environment, he or she should have racial self-awareness and general knowledge about the nature of race relations in the U.S. With this awareness, it is possible to recognize, react, and cope with blatant or indirect encounters with racial discrimination and hostile racial environments.

Even if one is able to recognize racism it is possible that allegations of racism or racial discrimination can sometimes be false or inaccurate. Nevertheless, it is important to recognize that targets can feel and be harmed by events attributed to racial discrimination, and traditional assessment tools may not adequately capture the emotional and psychological reactions that people have to such encounters. Finally, Carter (2007) argued that DSM criteria fails to assess racial aspects of peoples' experiences and that the criteria do not consider the effects of emotional pain as a result of traumatic stressors. It is important to be mindful that one may experience emotional pain as a result of both perceived and objectively verifiable acts of racial discrimination, as well as less objectively verifiable acts (i.e., acts that may be painful to the target, or acts that are otherwise ambiguous). It is also possible that the determination of the psychological impact may or may not be objectively verifiable, since in many instances the determination of harm is based on subjective perception. That racial bias cannot be objectively verified does not mean that the person did not feel distress from his or her encounter.

**Social Framework Conclusion**

The wealth of research, scholarship and lawsuits cited throughout this document provide evidence that Black employees have claimed to be targets of racial bias, both by their employers

and by their respective unions, and that experiences with racial discrimination have a significant negative impact on their physiological and psychological well-being. While Black people have learned to cope with these experiences, it is clear from research that they generally expect people in positions of authority (e.g., managers, union representatives) to be helpful, not demeaning (Crockett, et al., 2003). The power dynamics between employees and those in positions of authority make it particularly challenging for employees to deal with acts of racial discrimination.

A fairly large body of research shows that although people today do not usually openly express racial bias toward racial minorities, evidence demonstrates that they nevertheless hold negative feelings and attitudes and they will discriminate in subtle ways ("aversive racism"; Dovidio & Gaertner, 2002). As noted previously, modern day racial bias is cloaked in values of equality and non-prejudiced beliefs. Thus, people rarely discriminate directly or openly. Instead, they enact their biases through discriminatory company hiring practices, job assignments, promotions, and transfers, etc. In some cases, bias is enacted through failure by unions to represent racial minority employees and/or to process complaints of racial discrimination, thereby contributing to racially hostile work environments.

**This report and the opinions contained within are preliminary and subject to revision once and if other testimony becomes available. According to Ms. Yocom, the Court has set an early August deadline (8/10/12) for this report. However, while I submit this preliminary report to comply with the Courts' order - I have not had a chance to review some of the defendant testimony or information from other documents that might**

be relevant to the facts of this case. Therefore, my opinions may change once the material that I requested becomes available.

## OPINIONS

My opinions are based on my training, education, and experience with and research on complex racial issues; an analysis of the research evidence about the psychological, emotional and health impact of racial discrimination that exists in the legal, social science and psychological literature; the testimony in the case; the direct in-person interviews I conducted with Mr. Moultrie; and other documents that I reviewed.

*I hold the following opinions to a reasonable degree of professional certainty:*

**Power differences between the plaintiff, union stewards, and his supervisors played a central role in the psychological injury suffered.**

A critical aspect of this case that frames the situation and helps one to understand Mr. Moultrie's behavior is the power difference between him and his supervisors. His primary recourse was the union and it is alleged that they did not properly process his claims of racial discrimination. Therefore, Mr. Moultrie was powerless to prevent or grieve his demotion and other write-ups as a result of discrimination on the part of the union.

While the union's collective bargaining agreement has anti-discrimination components, I could not find, in the documents I received, the procedure one could use to file a racial discrimination complaint thru the union or through Penn Aluminum. The human resource manager testified that such procedures were posted. This information was not presented to me

for review. It is alleged that the union steward and/or union representative did not help Mr. Moultrie to submit or process his grievance of racial discrimination. It is alleged that his supervisors as well as the union steward and representatives simply did not include racial discrimination in his grievances.

Deposition testimony indicated that few people supervisors or union stewards or representatives could recall details of meetings or discussions that involved Mr. Moultrie, nevertheless they all contend that they can recall him saying nothing about race.

**Mr. Moultrie attempted to have his alleged experiences of racial discrimination and retaliation by the defendants heard by bringing an external action through the Illinois Department of Human Rights.**

There are several points I want to make about the Illinois Department of Human Rights investigation concerning the allegations made by Mr. Moultrie. I have summarized these points and I present an opinion of their findings.

The Illinois Department of Human Rights denied Mr. Moultrie's claim of racial discrimination at Penn Aluminum on the grounds that there were no civil rights violations in his human resource records. My opinion is in part drawn from research and other evidence to show that the department's conclusions may not be accurate given Mr. Moultrie's account of what took place. If you assume that what he alleges is true then there should be a record of his racial discrimination compliant.

It is clear from deposition testimony and from my direct interview with Mr. Moultrie that he has more than two decades of experience working at Penn Aluminum and that as a result of that longevity he would have knowledge of events and practices that may not have been documented by the union or the company. He might know whether employees engaged in acts or

actions that did not result in documented discipline. There is, in the Penn Aluminum records, a communication from an employee that indicates there were unwritten or informal rules that forbade them from creating written records to document certain types of events.

Furthermore, there are several shortcomings in the investigation conducted by the Human Rights department. One shortcoming was the reliance on supervisors and human resources personnel and official records at Penn Aluminum for the primary evidence upon which they rendered their decision. Although it may be the department's practice to allow the company to respond to the discrimination claims, it seems limited to use only what Penn Aluminum provided as the evidence to judge Mr. Moultrie's claim of racial discrimination. The department did not use any other interviews or any statistical analysis of the relative frequency to which Black employees were disciplined, demoted, or terminated at the company.

Consider further the evidence regarding how minorities deal with their experiences of racial harassment or other forms of discrimination. It should be noted that although researchers (e.g., Roscigno, Karaffin, & Tester, 2009) frequently have asserted that racial discrimination is under-reported, there is less research on the extent to which targets of racial discrimination and harassment report their experiences or the reasons why targets would hesitate to report racial experiences. Research on the reporting of sexual harassment is available and is quite extensive. The personal and institutional factors and power dynamics that influence the reporting of sexual harassment are similar to those associated with racial harassment and discrimination, so sexual harassment research reveals that withholding information about experiences with harassment is common under circumstances that are similar to the circumstances in this case.

Failure to report harassment for fear of retaliation is common among targets of sexual harassment, with research indicating that, in some samples, as few as 8% of targets file reports

(Bergman, Langhout, Palmieri, Cortina & Fitzgerald, 2002; Brooks & Perot, 1991; Culbertson & Rosenfeld, 1994). Research on survivors of harassment provides empirical evidence that victims are less likely to report harassment the more powerful the perpetrator (i.e., supervisors or human resource personnel; see Bergman, et al., 2002; Lee, Heilmann, & Near, 2004; Wasti & Cortina, 2002). It has been found that reports of harassment frequently trigger retaliation or are met with minimization by the organization to which the report is made (Bergman et al., 2002; Lee, et al., 2004). The willingness of targets to report harassment is further influenced by their own vulnerability within the organization. Research has found that among working class women, women of Color were less likely than White women to report their experiences of harassment, and that as the power of the perpetrator and the frequency of the harassment increased, both groups of women became less likely to report the harassment and were more likely to avoid or attempt to negotiate directly with the perpetrator to end the harassment (Wasti & Cortina, 2002).

Research has also found that targets of harassment are more vulnerable because of lower levels of income or education, are also the most likely to suffer retaliation from powerful harassers (Lee et al., 2004). Consistent with the research in this area, the plaintiff in the current lawsuit reported experiencing retaliation because he tried to file grievances that alleged racial bias and mistreatment.

Researchers have also found high rates of cultural mistrust, or a tendency to distrust Whites and mainstream institutions among Black Americans as a result of an extensive history of community experiences with racial bias in institutions and interpersonal relations (Whaley, 2001). It is plausible that feelings of cultural mistrust would decrease a Black American's confidence that a report of racial harassment would be met with positive action.