In addition, research has found that, in laboratory settings, Black Americans are often hesitant to openly report that racial discrimination is the cause of negative experiences, even when they are 100% certain that it is to blame (Ruggiero & Taylor, 1997). Black Americans are also less likely to publicly report experiencing discrimination due to sensitivity to the social costs of doing so (e.g., being labeled as trouble-makers; Stangor, Swim, Allen, & Sechrist, 2002).

Taken together, this research indicates that members of vulnerable groups have high rates of distrust for institutions and that they are more likely to experience retaliation when they report racial harassment. As a result, they are generally unlikely to report experiences of discrimination and harassment due to sensitivity to and fear of retaliation.

Mr. Moultrie's testimony and interview statements in the current case make clear that he thought he was being subjected to a racially hostile environment in which he was the target of harassment and intimidation by his supervisors and union personnel. In addition, he attempted to report the biased behavior to the union representative, but his claims were not passed on and no action was taken regarding his grievances as he claimed they were stated.

Mr. Moultrie's racial allegations were not documented and thus could not be corroborated. Furthermore, it appears that in the situations where his statements were not corroborated, the persons who failed to corroborate them were either union stewards or Penn Aluminum staff, most of whom are White. The failure of persons in positions of power, who are from different racial backgrounds than Mr. Moultrie, to corroborate his account could be the result of differences in perceptions of his alleged offenses and of the significance attributed by others to his race-based claims. There is support for this possibility in social science research.

Five decades of research on racial attitudes has consistently found that White and Black Americans differ in their attitudes on a variety of issues related to race, such as perceptions of the

existence and consequences of discrimination, perceptions of police brutality, beliefs about the causes of socioeconomic disparities between Blacks and Whites, and support for the death penalty. For example, a national Gallup poll (Jones, 2008) found that 78% of Blacks felt that racism against Blacks is widespread, but only 51% of Whites agreed. Similarly a national survey (2000 and 2004) found that 61% of Blacks believed that discrimination was to blame for socioeconomic inequality between the races, while only 31% of Whites agreed (Hunt, 2007).  A survey of residents in a major Midwestern city found that Whites were less likely to believe that local police are unfair to Blacks (64% Whites, 90% Blacks), that Blacks are discriminated against in general (11% Whites, 76% Blacks) and that many Whites in the United States harbor Klan-like racial attitudes (24% Whites, 43% Blacks; Seligman, Welch, Bledsoe, & Combs, 1997). Seventy three percent (73%) of Whites also support the death penalty compared to 29% of Blacks (Unnever & Cullen, 2007), and one third of the divide between Blacks and Whites in support of the death penalty has been statistically associated with the influence of increased negative perceptions of Blacks as irresponsible and culturally deficient (Unnever & Cullen, 2007).

      Finally, laboratory research has also found that Whites perceive incidents of racial harassment, including blatant threats, the use of racially offensive symbols, and intimidating acts of vandalism, as less severe than Black Americans and Latinos (Chrobot-Mason & Hepworth, 2005). <u>If African Americans or other racial minorities see themselves as victims of racial discrimination it is often believed that they bring it on themselves or are making a bigger issue of things then they should.</u>  The end result is that when it comes to racial discrimination in American society, most White Americans "naturally" gravitate to the role of bystander and do little (Bryant-Davis & Ocampo, 2005; Rosado, 1998).

Taken together, this research suggests that White and Black Americans hold widely divergent perceptions of the influence of racism on daily life, and that their perceptions of social and political issues related to race may be influenced by negative racial attitudes towards Blacks. Research suggests that these divergent perceptions influence assessments of the severity of incidents of racial harassment. As such, it seems possible that, given their divergent experiences with race and racial discrimination, the White union and Penn Aluminum company staff could have been predisposed to view claims of racial discrimination as not compelling, important, or believable.

Additionally, the review of legal cases of racial discrimination by companies and labor unions provides evidence that there have been documented cases where labor unions <u>failed and/or refused to assert racial discrimination as a ground for a grievance, failed to process grievances for Black employees on the same bases as for White employees,</u> and <u>failed to take claims of racial discrimination to arbitration.</u> These cases support the assertion that it might be possible for the company and union personnel at Penn Aluminum to have ignored Mr. Moultrie's complaints even though his claims may have had merit and thus should have been taken seriously. Thus, it is possible that Moultrie's claim could have been dismissed and not documented or processed, thereby leaving no official documents to corroborate his claims of civil rights violations.

**<u>The preponderance of the empirical research on racism provides strong evidence that racial discrimination has a negative, often severe impact on its targets.</u>**

Analysis of research on racism provides further support for my opinions on the case. Extensive empirical research documents the continued occurrence of racial discrimination and harassment in the United States. Researchers have found that racial discrimination is prevalent

across many domains, particularly for African Americans in the workplace, with prevalence rates ranging from 37% to 89%. Researchers have found that racial discrimination by employers and unions has been and remains common, and that claims and charges of racial harassment by employers have increased (see EEOC information). Furthermore, the research evidence indicates that African Americans are more likely than members of other groups to face instances of racial discrimination in the workplace. Moreover, a review of lawsuits brought by Blacks and other minorities against unions and employers suggests that the alleged actions in this case have been the basis for litigation in previous cases.

    The claim that Mr. Moultrie was emotionally and psychologically harmed by the events at Penn Aluminum is possible. There is support for the possibility as reflected by decades of empirical research that has provided strong scientific evidence that racism is experienced as a stressor that has a negative impact on the mental health of those targeted. Researchers have found associations between racism and a variety of indices of negative mental health, and statistical meta-analysis of a large number of studies has also found significant associations between exposure to racism and clinical symptoms (i.e., depression and anxiety).

    Despite this evidence, the mental health impact of exposure to racial discrimination or harassment is not specifically considered in psychiatric diagnostic manuals. Based on examination of the extensive empirical evidence, I argue that psychological reactions to stressful and traumatic experiences with racism are a type of race-based traumatic injury that is expressed in symptom clusters. As noted in my research review, the intensity of the impact of stress is influenced by a person's ability to effectively cope with the stressor. When the stress of an event overwhelms one's ability to cope, deleterious health and mental health consequences can and often do occur. Furthermore, both the nature of the stressor and characteristics of the person are

factors that might increase the psychological impact by depleting the resources available to cope.

Older people, and those with fewer resources, are particularly vulnerable to the impact of stress due to their limited access to social, financial, and psychological resources. These populations have greater difficulty coping effectively with racism, making them vulnerable to increased psychological impact. The psychological harm reported in this case is consistent with the extensive literature on the psychological impact of racial discrimination and harassment.

*It is my opinion* that Mr. Moultrie possessed general knowledge about race with which to assess and recognize his racial encounters as racial harassment and a racially hostile environment. He contends that the events that he alleged occurred were out of his control, unpredictable, and negative (emotionally painful). He also tried to cope with the situation to reduce the stress he felt. He stated that his efforts to complain were in vain and that his complaints were met with retaliation.

*I found that the symptoms and reactions reported by Mr. Moultrie are consistent with those found in the extensive research literature on the psychological impact of racial discrimination, and they are also consistent with the symptom cluster associated with race-based traumatic stress injury.* Furthermore, consistent with research in this area, I found that the limitations on coping resources, as a result of the his seniority, educational level and limited economic resources, made him all the more vulnerable to the psychological harm associated with exposure to racial harassment and discrimination.

## Mr. Moultrie suffered race-based traumatic stress symptoms

Consequently, I opine that Mr. Moultrie, who I interviewed, suffered emotional distress in the form of race-based traumatic stress injury. It is my opinion that, *to a reasonable degree of professional certainty,* Mr. Moultrie was emotionally and psychologically harmed by the racially

hostile environment and the racial discrimination he encountered at Penn Aluminum et al. by the actions of union steward(s) and representatives, as well as by the Penn employees and supervisors.

The following is my assessment report:

*Assessment of Race-Based Traumatic Stress Injury*

<u>Identifying Information</u>

Mr. Levia (Lee) Moultrie is a 67-year-old, lower middle class Black male. The purpose of this assessment was to determine whether Mr. Moultrie was injured emotionally and psychologically by the alleged racially hostile work environment and acts of racial harassment/discrimination at Penn Aluminum Co. Mr. Moultrie was referred for a race-based traumatic stress injury evaluation in the matter of Moultrie v. Penn Aluminum et al. To that end, I conducted race-based traumatic stress injury interviews on July 14th and 15th, 2012.

<u>Relevant Background, Social History, and Racial Experiences</u>

Mr. Moultrie was born in Selma and raised in Mobile, Alabama. He is the fifth of eight children, with two older sisters, two older brothers, and three younger sisters. Mr. Moultrie attended school from first grade through high school, while living with his parents in Mobile. His father worked as a long-shore man on the riverfront and his mother was a homemaker.

Mr. Moultrie completed school at the Cedar Grove Academy where the school day was shorter, allowing him to work after school. He graduated high school when he was 18 years old. He was an average student throughout school and attended all Black schools. While still in school he started working at a grocery store and a state warehouse where he moved canned goods and packed things. He had to work to get the extra things he wanted because his family could not afford to buy them for him. Mr. Moultrie reported being in good health and had no

history of behavioral issues at work or school.

After high school, Mr. Moultrie worked full-time at the riverfront like his father and retained his warehouse job part-time. He did both jobs for 3 years or from 1962-1965. In 1965, he was drafted into the Army and was sent to Vietnam for 13 months of his two years in the service. While in the army he was not a fighting soldier, but he nevertheless witnessed death and torture during his active military service. For instance, he saw a Buddhist being killed while driving a truck in an army convoy. Upon returning home, he suffered nightmares and flashbacks from the distressing events he witnessed in the Army.

After completing his tour in the Army Mr. Moultrie returned to working on the riverfront until he was hurt and had to stop working due to his injury. He moved to Illinois to be close to his sisters and to attend a community college. While waiting to be admitted to college, he worked for a van line moving furniture and he held a factory job making tape for a few months. His next position was with the Carbondale police department as an officer. He held that position from about 1970-1976. He then drove a dump truck from 1976-1978, and took a job with the Union Pacific Railroad from 1978-1985 where he worked as a welder and track repairman. He was laid off from this position and was unemployed for about 2 years. There may have been other jobs – not reported. In 1978, he joined the Army National Guard. After the unemployed years, he worked for Mayflower Bus Company as a school bus driver, until he was hired at Penn Aluminum in 1990.

Racial Experiences

While growing up in Mobile, the city was racially segregated: there were White and Colored ONLY signs in public places. Mr. Moultrie' parents explained to him when he was young that it was important for him and his siblings to stay out of trouble. That meant that he had

to follow the rules about segregation; that the rules were the law, and failure to follow the rules would result in arrest or worse. He still, however, thought it was not right and had a hard time believing there were such laws. Mr. Moultrie felt disheartened by the information and his experiences. Once, he recalls not sitting at the back of a bus and was very aware of the looks he received for this violation. He also knew that there were parts of town that were White only or Black only. While he noticed the racial differences, he always thought it was wrong; he thought that people should be treated that same. He had also observed, while growing up, how Whites and Blacks were treated differently. Whites would do things that Blacks could not. Whites, when he was younger, would often shoot guns at Blacks and nothing was done about it. When he was traveling with his father once they stopped for gas yet they were not allowed to use the bathroom.

One reason that Mr. Moultrie moved to Illinois was so that his children would have a better life and not have to grow up with segregation. However, he found out that it was worse in his new state, because he was called a "N-word" for the first time in Illinois. Also, while he worked as a police officer he saw Whites not being stopped for drinking and driving or without taillights, yet he noticed that Blacks would be stopped for any reason.

Mr. Moultrie saw these differences in his family. His father was so light skinned that he could pass for White. He was told that when his father traveled around alone he would not be stopped because people though he was White. There were stories that his father would bring Blacks up north since Whites would not stop his father.

Mr. Moultrie realized that there were opportunities he, as a Black person, could not have. He applied for some jobs for which he never received a response, and he was aware that some types of positions, like working in a bank or as a clerk, would be given mostly to Whites. He

knew that labor jobs were all that he could get. Also, while he worked on the railroad and traveled around the state, he reported that some hotels and motels would refuse to rent him a room because he was Black. He was also often stopped by the police in small towns and asked to identify himself. He felt strongly that this behavior was about his race.

While in the army in Vietnam he went to a bar in the area where he was serving and was refused service at a bar; he thought the refusal from the White American service men who frequented the bar. Moultrie was very upset about the fact that –racism traveled to this faraway place where he was in the middle of a war.

While serving in the National Guard he realized that he had been passed over for promotion. When he finally earned the promotion after six years of service he suspected the delay was due to racial bias since Whites were promoted when he was not even though he had been there longer. Mr. Moultrie complained about racial discrimination to his superiors and once they looked into his complaint he was promoted.

**Summary of Incidents at Penn Aluminum (see deposition testimony and appendix A for full details)**

Events From Penn Aluminum's Perspective

Penn Aluminum is a manufacturer of aluminum. There are two departments within the factory. Mr. Moultrie's department produces aluminum tubing for the climate control division of automotive plants. The other department produces aluminum shapes used for storm doors and heat sinks in electronic equipment. He began employment with Penn Aluminum in July 1990 as a block operator. Mr. Moultrie was a forklift driver, on the day shift (7am -3pm) intermittently from January 1993 until April 2009, with his most recent return to that position being in September 2008. Mr. Moultrie's forklift driver position was an off and on position, between the above noted

dates, as the result of employee bumping and bidding rights. His supervisor was Kenny Sizemore, (White; age 38). On September 8, 2008, Mr. Moultrie was issued a verbal counseling for substandard job performance. On September 10, 2008, he was issued a verbal warning for substandard job performance. On September 22, 2008, he was issued a verbal counseling for substandard job performance.

On October 16, 2008, Sizemore and Paul Crawford, (White; age 56) Department Manager ("Crawford"), met with Mr. Moultrie to discuss his job performance and the possibility of his being disqualified from the forklift driver position. On February 17, 2009, Mr. Moultrie was counseled for substandard job performance. On February 21, 2009, Mr. Moultrie was counseled for substandard job performance. On February 26, 2009, Mr. Moultrie was counseled for substandard job performance. On March 3, 2009, Mr. Moultrie was counseled for substandard job performance. On March 4, 2009, Mr. Moultrie received a written warning for substandard job performance. On March 5, 2009 Mr. Moultrie received a final warning for substandard job performance. On March 16, 2009, Mr. Moultrie was placed on a six-month probation due to substandard job performance and was warned of the possibility of being disqualified from the forklift driver position.

On April 2, 2009, Mr. Moultrie was disqualified from the forklift driver position after another incident of substandard job performance. On April 9, 2009, Mr. Moultrie was placed in a tube packer position. Penn Aluminum has three forklift positions, which until April 9, 2009, were filled by Mr. Moultrie, Matt Lee, (White; age 50) Forklift driver and Terry Davis, (White; age 34) Forklift driver. After April 9, 2009 Mr. Moultrie's forklift position was filled by Dave Billups (White; age 53).

Mr. Moultrie filed four union grievances: on February 27, 2009 he filed a grievance

regarding job duty assignment; on March 9, 2009 he filed a grievance regarding a disciplinary action (written warning) issued on March 5, 2010; on April 17, 2009 he filed a grievance regarding a disciplinary action (forklift driver disqualification) issued on April 2, 2009; on April 17, 2009 he filed a grievance regarding the issuance of all discipline related to the operation of a specific piece of equipment. Mr. Moultrie's last evaluation, which was conducted by Sizemore, was completed in February 2009 with an overall rating of needing improvement. Mr. Moultrie has the right to bid into another position. Mr. Moultrie's wage as a forklift driver was $12.57 per hour and is $12.37 per hour as tube packer.

Events as told from Mr. Moultrie's Perspective

Mr. Moultrie reports that from the time he started working at Penn Aluminum in 1990 he observed that many of the White employees would have accidents or damage property or harm other employees and no disciplinary action would be taken against them. He argues that he observed systematic differences in the application of discipline for White and Black employees. Furthermore, he feels that many, if not most, of the warnings and write-ups he received were the result of unfair working conditions wherein he was called upon to do more work than required of his position and/or were due to racial bias in disciplinary procedures.

Mr. Moultrie was hired to work the midnight shift and started as a 66-block machine operator. He was subsequently moved to the 56-block machine. Then, about one to two years later, he bid for the 66-block on the day shift. During these years, he states that he would fill in for the forklift driver since he had a driver's license and had prior experience driving a forklift (while he worked on the riverfront); thus he worked two jobs. For two to three years he worked the 66-block on days. Then the block was taken out and he bid for the forklift position, which was the only position open at the time. He held this position for several years. Then he bid out to