work the baler, because the other forklift driver on the day shift often slept on the job (with no discipline) and Mr. Moultrie was tired of doing the work of two employees.

Mr. Moultrie worked the scrap baler from about 1995 to 1998 until the scrap baler was cut out and he went back to the forklift until about 2000, at which point he bid to work the utility coiler, which was an easier job. He reports that he chose to bid for an easier job because his experience had been that while working the forklift he was consistently expected to do more than his White co-workers. Even after he was no longer working the forklift he would be asked to help E. Riley, who was the driver. Mr. Moultrie complained about this, but the union steward would not file his grievance about him doing work for E. Riley. He also tried to give up his license to drive the forklift but the company would not take it. He then bid on the scrap hauler job and moved to loading trucks. After that, he bid the chopper, but he was still expected to help E. Riley on the forklift and help the machine operator as well. He did this work as was expected of him until the chopper job was cut and he returned to the forklift.

Around 2008/09, while working the forklift, Jeff Drake asked him to work the chopper and Mr. Drake put Dave Billups on the forklift. The chopper was very dirty with lots of oil that would get all over him. Mr. Moultrie believes that the action to have him taken from the forklift to work the chopper was racial because the White employee had 5 years experience and he had more than 15. He also thought that because any one could do the chopper job, no training was needed, and the White employee did not want to do the job since it was so dirty and oily. Mr. Moultrie said he pointed out to Mr. Drake that if he were White he would not be sent to do the dirty work. Drake said, according to Mr. Moultrie, that regardless he must do the job. Mr. Moultrie says that he discussed the situation with Steve Gale, the union steward, and Steve agreed with him. Mr. Moultrie filed a grievance about racially biased treatment. After filing this

grievance, he was later disqualified from the forklift job subsequent to a series of incidents or write-ups. Mr. Moultrie suspected that these write-ups were retaliation for filing the grievance about racially biased treatment.

    Prior to being assigned to the chopper job, over his first 15 years of working for Penn Aluminum, Mr. Moultrie could recall only a few times when he was written up. Aside from the times many years ago when he was written up for coming to work late or missing work, he felt that most of his write-ups illustrate a pattern of his being written up for incidents that White employees would not have been written up for. He also reports that it was not made clear to him when a write-up was a warning or when it was something more serious. Once, when on the forklift, a coil fell off and the company said that it was his fault. He stated that the tube fell because the weld broke and he was not at fault. Mr. Moultrie felt certain that a White employee would not have been written-up for this incident. Another time a door came down on the forklift and Mr. Moultrie was blamed, rather than the person who closed the door. Another incident occurred when a rod was found sticking out of an oven and again he was blamed.

    Following his initial grievance about racially biased treatment when Mr. Drake assigned him to the chopper, Mr. Moultrie reports that the frequency of write-ups increased significantly. In 2009 there were a several incidents, many of which he grieved. In one incident Mr. Moultrie took a coil from the block to the straightener machine, he set it down, backed out, and the coil slid off the fork and hit a blackboard, but the coil was not damaged. He was written up for this incident, but could not recall if it was a warning or not. Warnings were supposed to be temporary and removed from a file after 90 days. He grieved the write-up. After the coil incident, one day he was working at oven number 4 and it was not started before he left for the day. He was blamed for this and written up. Yet, it was his understanding that the people from quality control

were supposed to turn the oven on, not him. He grieved this write-up as well. Another issue arose regarding oven number 5. Oven number 5 had a load that seemed to be ready, he was told to take it out but when he looked at the chart it said the load was not ready. He tried to call his supervisor and received no answer. He also called quality control and there was no answer. By the time he found the supervisor the load was late. The supervisor would not accept his version of events and said, according to Mr. Moultrie, that there were no excuses. He was written up for this incident as well. He grieved this action. There was also an incident involving wrong tags that was blamed on him and that he grieved. There may have been other incidents that resulted in additional write-ups or warnings that disqualified him from the forklift.

    A number of events occurred at a time when Mr. Moultrie's regular supervisor (Kenny Sizemore) was not working, and Mr. Drake was covering the shift.  Mr. Moultrie recalls an incident with Mr. Drake regarding Moultrie's forklift. Mr. Drake wanted to take Mr. Moultrie's truck and change it with an older truck from the Press department. Drake claimed that the forks on Moultrie's truck were longer, which according to Mr. Moultrie, was not the case. Moultrie told him (Drake) that the forks were the same size and the only difference between the trucks was that Moultrie's truck was newer. Drake told him "take the truck to them - I am tired of you people telling me what you ain't goin to do".  Moultrie took the truck to the other department. Then, Moultrie spoke to Mr. Drake's supervisor about the forklift change and he told Moultrie to get his truck back. Moultrie felt strongly that Drake's reference to "you people" meant Black people in part because Drake was having trouble with Black people on his shift. There was an incident in which Drake and a Black employee "got into it" and the police had to be called to escort the Black employee, who was let go, off the premises.

    Mr. Moultrie also cites the example of the employee who ran into a door with the forklift

twice causing damage until a sign was put up. That White employee was not disqualified from driving the forklift. Mr. Moultrie also points out that, during the last five-six years, there were two to three (2-3) forklift drivers on the day shift. Due to less work, the number was reduced and he became the sole driver for about six months before he was moved out of the position. Thus the claim that he could not keep up was, in part, due to the fact that he was doing the work that it usually took three people to do. After he was moved out of the position he notes that there have been three people helping with the forklift driving duties.

    Mr. Moultrie reports that while he worked as a forklift driver he had more than one task, unlike other drivers, who had only one task. He states he had to a) haul packing (back and forth), b) move material from the degreaser, c) load oven number 4 sometimes, start it and unload it, and d) replace and remove skids from the degreaser. To illustrate his point he observed that after he was disqualified, the degreaser operator was given a forklift operator license – so he could move material (even though he was known to drink). He further notes that the new forklift driver that took over for him was not required to do the extra work he did. And not long after his disqualification, D. Billups was found sleeping on his truck with the load up in the air (he might have lost his job for that).

    Mr. Moultrie contends that all of the grievances he filed with S. Gale were racial in nature. Mr. Gale stated, according to Mr. Moultrie, that he (Gale) could not do anything about the racial issues. Moultrie was told to contact Ms. Marsha Steele, the union representative, about these issues. Mr. Moultrie reported his concerns to Ms. Steele. She indicated that she would look into it, but no further action was taken.

    The company and union people held a hearing about Mr. Moultrie's grievances, but according to Moultrie only two issues, the chopper and coil incidents, were discussed. They took

a break before Moultrie could raise issues and then P. Crawford offered Mr. Moultrie a change in jobs and departments in exchange for dropping the grievances against him. If he took the offer he would lose his 10-20 years of seniority and make less money. He refused the offer. He has lost pay after his disqualification.

Medical History

Mr. Moultrie reported no health issues while growing up or as an adult. While working at Penn Aluminum he had few health issues. He claimed to have had symptoms of Post-Traumatic Stress Disorder (PTSD) after returning from Vietnam. In particular, he reports having flashbacks and nightmares after his time on active duty. His symptoms of PTSD caused him considerable trouble sleeping. The symptoms passed in time.

Assessment Findings: Emotional and Psychological Impact of Events at Penn Aluminum

Mr. Moultrie states he was demeaned, humiliated, and made to feel helpless by being demoted. He indicated that he felt like a fool, who was betrayed and treated in a way that he did not deserve since he was doing his job. He feels his disqualification was a way to put him in his place for bringing up race.

**Opinion**

Mr. Levia Moultrie had and has the needed general and personal knowledge and self-awareness about race to assess and recognize his encounters as being racial discrimination and a racially hostile work environment. He indicated that the racial experiences at Penn Aluminum were beyond his control, unexpected and emotionally painful or negative.

Mr. Moultrie tried to cope with the stress of the situation although he believed that his options were limited, given the alleged lack of action by the union and Penn Aluminum in response to his complaints of racial discrimination. He turned to the Illinois Department of

Human Rights to address his experiences of racial discrimination. The department did conduct an investigation, but denied his claim of racial discrimination noting that there were no civil rights violations. None of his efforts to adapt and cope with the racial discrimination he alleges were successful.

<u>Mr. Moultrie exhibits signs and symptoms of race-based traumatic stress injury</u>; he is and has been depressed (lacks energy and is tired all the time), angry, has intrusive thoughts, engages in avoidance behavior and shows signs of physical reactions and shame. He reported experiencing significant anxiety while working at Penn Aluminum after his demotion, as well as having problems sleeping. He reports decreased intimacy in his marriage and increased avoidance of family and friends subsequent to his experiences at work. He notes that his flashbacks and nightmares from the past have returned. In his interview, he noted that his reactions were observed and experienced by others. He was visibly upset and in some emotional pain during my interview about the events that he recalled and still endures. He talked about feelings of humiliation that he experienced when the Penn Aluminum supervisors and union representatives singled him out because of his race, a belief that is still strong. His alleged experiences at Penn Aluminum are a proximate cause of the psychological and emotional injury he has and continues to suffer. I believe that the degree of the race-related traumatic stress injury and associated symptoms have caused clinically significant distress and impairment that persist today. I may have additional opinions and reasoning depending upon the review of additional material.

Respectfully submitted

*[signature]*     Robert T. Carter, Ph.D

Reference List

American Psychiatric Association (2000). *Diagnostic and statistical manual of mental disorder* (4th ed.) Text Revision. Washington, DC: American Psychiatric Association.

Archie Jackson v. New York City Transit, 2005 U.S. Dist. Lexis 25111 (E.D. of NY 2005)

Armstrong v. School District of Philadelphia, 597 F. Supp 1309 (District Court E.D. of P.A., 1984).

Banks, K. H., Kohn-Wood, L., Spencer, M. (2006). An examination of the African American experience of everyday discrimination and psychological distress. *Community Mental Health Journal, 42(6),* 555-570. Impact Factor 1.323

Bennett, G.G., Wolin, K.Y., Robinson, E.L., Fowler, S., & Edwards, C. (2005).   Perceived racial/ethnic harassment and tobacco use among African   American young adults. *American Journal of Public Health, 95*(2), 238–40.

Bergman, M., Langhout, R., Palmieri, P., Cortina, L. & Fitzgerald, L. (2002). The (un)reasonableness of reporting: Antecedents and consequences of reporting sexual harassment. *Journal of Applied Psychology, 87*(2), 230-242

Bobo, L, D. (1999). Prejudice as group position: Micro-foundations of a sociological approach to racism and race relations. *Journal of Social Issues,*    *55*(3), 445-472.

Borrell, L., Jacobs, D., Williams, D., Pletcher, M., Houston, T., & Kiefe, K. (2007).  Self-reported racial discrimination and substance use in the coronary artery risk development in adults study. *American Journal of Epidemiology, 166,* 1068-1079.

Brief, A.P. & Barsky, A. (2000). Establishing a climate for diversity: Inhibition of prejudice reactions in the workplace. In G.R. Ferris (Ed.). *Research in Personnel and Human Resources Management* (pp.91-129). Greenwich, CT: JAI Press.

Brief, A. P., Butz, R. M., & Deitch, E. A. (2005). Organizations as reflections of their environments: The case of race composition. In R. Dipboye & A. Colella (Eds.), *Discrimination at work: The psychological & organizational bases*. Mahwah, NJ: Lawrence Erlbaum Associates, Inc.

Broman, C. L., Mavaddat, R., & Hsu, S. (2000). The experience and consequences of perceived racial discrimination. *Journal of Black Psychology, 26(2),* 165-180.

Brondolo, E., Thompson, S., Brady, N., Appel, R., Cassells, A., Tobin, J. N., & Sweeney, M. (2005). The relationship of racism to appraisals and coping in a community sample. *Ethnicity & Disease, 15*, 14-19.

Brondolo, E., Brady ver Halen, N., Pencille, M., Beatty, D., & Contrada, R. J. (2009). Coping with racism: a selective review of the literature and a theoretical and methodological critique. *Journal of Behavioral Medicine, 32*, 64-88.

Brondolo, E., Brady, N., Thompson, S., Tobin, J. N., Cassells, A., Sweeney, M., et al. (2008). Perceived racism and negative affect: Analyses of trait and state measures of affect in a community sample. *Journal of Social and Clinical Psychology, 27*(2), 150– 173.

Brondolo, E., Rieppi, R., Erickson, S. A., Bagiella, E., Shapiro, P. A., McKinley, P., et al. (2003). Hostility, interpersonal interactions, and ambulatory blood pressure. *Psychosomatic Medicine, 65*,1003–1011.

Brooks, L. & Perot, A. (1991). Reporting sexual harassment: Exploring a predictive model. *Psychology of Women Quarterly*, 15, 31-47.

Broudy, R., Brondolo, E., Coakley, V., Brady, N., Cassells, A., Tobin, J. N., & Sweeney, M. (2007) Perceived ethnic discrimination in relation to daily moods and negative social interactions. *Journal of Behavioral Medicine, 30 (1)*, 31-43.

Bryant-Davis, T. & Ocampo, C. (2005). Racist-incident-based trauma. *The Counseling Psychologist, 33(4), 479-500.*

Cannon v. Bradbury Burial Vault Co., Civil No.: 09-4612 (District of NJ 2011)

Carlson, E. B. (1997). *Trauma assessments: Clinician's guide.* New York: Guilford.

Carter R.T. & Forsyth, J.M. (2009). A guide to the forensic assessment of race-based traumatic stress reactions. *Journal of the American Academy of Psychiatry and the Law. 37(1),* 28-40.

Carter R. T., & Forsyth J. M., (2010) Reactions to Racial Discrimination: Emotional Stress and Help-Seeking Behaviors *Psychological Trauma: Theory, Policy, Research, and Practice, 2(3), 183-191.*

Carter, R. T. (1995). *Race and Racial Identity in psychotherapy: toward a racially inclusive model.* New York, NY: John Wiley & Sons.

Carter, R. T. (2005a). (Ed.), *Handbook of racial-cultural counseling and psychology: Theory and research* (Vols. 1 and 2). New York, NY: Wiley.

Carter, R. T., Forsyth, J., Mazzula, S., & Williams, B., (2005b) Racial discrimination and race-based traumatic stress. In R. T. Carter, (Ed.), *Handbook of racial-cultural psychology and counseling: Training and practice* (Vol. 2) (pp. 447-476). New York, NY: Wiley.

Carter, R. T., Forsyth, J., Williams, B. & Mazzula, S. (2007). Does racism predict psychological harm or injury: Mental health and legal Implications. *Law Enforcement Executive Forum*, 7(5) 129-154.

Carter, R.T. (2007). Racism and psychological and emotional injury: Recognizing and assessing race-based traumatic stress. *The Counseling Psychologist, 35(1),* 1-93.

Chrobot-Mason, D. & Hepworth, W. (2005). Examining perceptions of ambiguous and unambiguous threats of racial harassment and managerial response strategies. *Journal of Applied Social Psychology, 35,* 2215-2261.

Clark, R., Anderson, N., Clark, V.R., & Williams, D. R. (1999). Racism as a stressor for African Americans: a biopsychosocial model. *American Psychologist, 54,* 805-816.

Collins, J. W., David, R. J., Handler, A., Wall, S., & Andes, S. (2004). Very low birth-weight in African American infants: the roles of maternal exposure to interpersonal racial discrimination. *American Journal of Public Health, 94 (12),* 2132-2138.

Collins, S. M. (1997). Black mobility in white corporations: Up the corporate ladder but out on a limb. *Social Problems, 44,* 55–67.

Contrada, R. J., Ashmore, R. D., Gary, M. L., Coups, E., Egeth, J. D., Sewell, A., Ewell, K., Goyal, T. M., & Chase, V. (2001). Measures of ethnicity-related stress: psychometric properties, ethnic group differences, and associations of well being. *Journal of Applied Psychology, 31*, 1775-1820.

Cooper v. Allied Barton Security Services, 2010 U.S. Dist. Lexis 68416 (Dist. of NY/ Affirmed by Crt of Apps. 2nd Circuit 2011 U.S. App. Lexis 10257).

Crawley v. Norfolk Southern Corporation. 11-1770. (2012).

Crockett, D., Grier, S.A., & Williams, J.A. (2003). Coping with marketplace discrimination: an Exploration of the experiences of Black men. *Academy of Marketing Science Review. 2003*(4) 1-18.

Culbertson, A. & Rosenfeld, P. (1994). Assessment of sexual harassment in the active-duty Navy. *Military Psychology*, 6, 69-93.

Deitch, E.A., A. Barsky, A.P. Brief, R.M. Butz, S.S.Y. Chan, and J.C. Bradley. (2003). Subtle yet significant: Everyday racial discrimination in the workplace, *Human Relations*, (56)11, 1299-1324.

Devine, P. G. (1989). Stereotypes and prejudice: Their automatic and controlled components. *Journal of Personality and Social Psychology. 56*(1), 5-18.

Din-Dzietham, R., Nembhard, W. N., Collins, R., & Davis, S. K., (2004). Perceived stress following race-based discrimination at work is associated with hypertension in African-Americans: The Metro Atlanta heart disease study, 1999-2001. *Social Science and Medicine.*

Donaldson v. Taylor Products Division of Tecumseh Products, Inc., et al., 620 F.2d 155 (7th Circuit, 1980)